Filed 12/2/15  P. v. Elmore CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>  v.<br><br>DOUGLAS ELMORE,<br><br>       Defendant and Appellant. | C072454<br><br>(Super. Ct. No. 09F07932) |

Defendant Douglas Elmore appeals following conviction for the murders of Tammula Robbins (Tammy) and her boyfriend Shawn Cope (Pen. Code, § 187; unless otherwise set forth, statutory references that follow are to the Penal Code), with personal use and discharge of a firearm (§ 12022.53, subds. (b)-(d)), a multiple-murder special circumstance (§ 190.2, subd. (a)(3)), and a prior burglary conviction in 2004 for sentencing under the three-strikes law (§ 667, subds. (b)-(i)).  Defendant contends (1) the trial court improperly excluded evidence of a witness's history of "bizarre behavior"; (2)

1

the court failed to instruct the jury to view defendant's pre-offense statement with caution; (3) defense counsel was ineffective in failing to request a jury instruction that a third party's suppression of evidence can be imputed to the defendant only if he knew and authorized the conduct; (4) the prosecutor in closing argument improperly commented on defendant's in-court demeanor laughing at his mother's distress during her videotaped interview with police; (5) the trial court improperly removed a juror during deliberations; and (6) the asserted errors were cumulatively prejudicial. We affirm the judgment.

FACTS AND PROCEEDINGS

The victims were found to be absent from their Sacramento residence on Sunday morning, October 11, 2009, and were found dead 12 days later, on October 23, 2009, in garbage cans near the house.

The 39th Street house was also occupied by defendant's mother (Rita Rose), Tammy's mother (Joleen Robbins), and a wheel-chair bound man ("Junior") who was almost never there and was not there during the time in question. Tammy and Cope slept on a mattress on the living room floor. About three weeks before the victims' disappearance from the home, defendant came to stay with his mother while his fiancée's house was being worked on and his fiancée and children were staying in Fairfield. Defendant slept in his mother's bed (at her insistence), and she slept on the bedroom floor.

Tammy was her mother's in-home care worker, but defendant's mother considered Tammy's performance "[n]ot up to par."

Tammy and Cope were close friends with Bernardo Quiroz and his wife Marlene Keola. On the evening of Saturday, October 10, 2009, the four smoked marijuana and watched a movie at the 39th Street house. The visitors left, but Quiroz later returned with his father-in-law to sell marijuana to Tammy -- a fact Quiroz omitted in his first police

2

interview but supplied in his second interview. When Quiroz returned, defendant was in the front yard with his girlfriend and children. Defendant's mother, Tammy's mother, and the victims' friend Laurie Clark were also in the yard. Quiroz testified this happened on Saturday night, but Clark said it was Friday. During his trial testimony Quiroz was hostile toward defendant; he stared fixedly at defendant, said defendant was ugly and "better hope I don't ever go to jail." The court admonished Quiroz several times.

Quiroz went to the 39th Street house around 11:00 a.m. Sunday, October 11, asking for Tammy and Cope. Defendant's mother said they were gone. The next day, Tammy's mother found Tammy's cell phone in the house.

On Tuesday, October 13, a sheriff's deputy came to the house and took a missing person's report. The deputy returned to the house later that day, after Quiroz found blood on the living room couch and two bloody pillows and a blanket in the back yard. Tammy's mother attributed the stains to Tammy's "female issues." Defendant's mother told the deputy she had not noticed anything unusual, and Tammy and Cope sometimes take off without telling anyone.

Quiroz found the police response lacking and put up fliers with the missing couple's photograph. He checked the house's outside garbage cans but saw only tree clippings.

Soon after the victims' disappearance, David Satyna and girlfriend Michelle Schortgen moved into the 39th Street home. Satyna had visited on prior occasions. On one prior occasion, Quiroz knocked Satyna unconscious after learning Satyna had been exposing himself to a neighbor's child.

About a week after the disappearance, a bad smell developed around the house. Sheriff's deputies noticed the smell when they went to the house on the evening of October 22, 2009, in response to a call from Tammy's mother about finding a suspicious jacket. The deputies did not consider the jacket suspicious but did notice the foul odor. It appeared to come from the side of the house, where the deputies found a pile of clothes

3

and debris. They poked at the pile with a stick. Using a flashlight in the dark, they lifted lids off two trash cans and saw only lawn and tree clippings. They told the occupants to clean up the yard.

Defendant's mother was the person who generally took the trash cans to the curb on Monday mornings. On the two Mondays after the victims disappeared, no one took the trash cans to the curb.

On October 23, 2009, neighbor Sandra Cardenas noticed defendant's mother and two other women putting black plastic trash bags in a car. They drove off and returned 10 minutes later. Around 3:00 p.m., Cardenas saw Satyna standing near the garbage cans that were now in front of defendant's mother's residence. Satyna looked around in all directions, as if checking to see whether anyone was watching him. He grabbed one of the cans and ran to a nearby field, wheeling the can behind him. He came running back a few minutes later without the garbage can, ran into the house, came out with a bag, and rode off on his bike. Neighbor Denise Abbott saw and found suspicious Satyna's conduct outside the house, hunching over with his hands on his knees and breathing heavily before he entered the house.

Sheriff's deputies responded to a call about a man pushing a trash can into a field. In the field they found an overturned trash can, a corpse, a tarp, some bedding, yard debris, and household trash. They learned Satyna had taken the garbage can to the field to dump it, and the dead body fell out of the can. In another garbage can in front of the victims' home, deputies found the other corpse covered by yard clippings and household trash. Defendant's mother directed deputies to a nearby dumpster, where they retrieved two torn trash bags containing bedding and pillows.

The pathologist estimated the female victim weighed about 250 pounds when she died, and her decomposed corpse weighed 140 pounds when found. The male weighed between 120 and 150 when alive and 51 pounds when found. Tammy had three gunshot wounds. One bullet -- a medium caliber consistent with a nominal .38 caliber -- entered

4

the left side of her forehead, just above her left eye, traveled in a downward trajectory, and lodged on the right side of the skull by the neck. Decomposition of the body prevented a determination of the distance from which the gun was fired. Another bullet entered her left shoulder blade and exited out the right breast, in a horizontal trajectory. The third gunshot wound passed through her right arm near the biceps and moved in downward trajectory toward her right elbow. The third wound could have been re-entry of the second bullet if she had her arm folded up by the breast. Thus, the forensic evidence was consistent with her having been shot while lying on her side or stomach.

Cope had a single, fatal gunshot wound. The bullet entered the middle of his forehead, traveled from front to back, a little bit left to right and downward, and lodged at the back of the skull. Cope would have been facing the shooter. Cope also had fractured bones, some caused by blunt force trauma to the bone between the nose and teeth.

Defendant's mother testified she saw nothing and knew nothing and claimed she must have been hallucinating from her mental illness when she told police the opposite in videotaped interviews, portions of which were played for the jury.

The day the bodies were found, defendant's mother told police she had no knowledge what happened, and it was common for the victims to disappear for a few days without telling anyone.

The next day, Detective Paul Belli was at the house for further investigation. Defendant's mother approached him, said she had more to tell him, and invited him to her room, where she had an open Bible. She said her son killed the victims. She agreed to be interviewed at the sheriff's department.

In her first videotaped interview, on October 24, 2009, defendant's mother said she heard gunshots on the night in question, went into the living room and saw defendant with a gun in his hand looking out the window. Defendant looked at her with a "scared stare." Defendant's mother saw the victims laying on their bed and thought they were sleeping but also said she thought they were dead. Cope was on his back with a bloody

5

nose, and Tammy was "[l]ike on her side or on her stomach" (which turned out to be completely consistent with the forensic evidence presented at trial). Defendant's mother did not know what to think. His mother was scared and retreated to her bedroom. She heard but did not see defendant moving around the house and outside. She went to use the bathroom and saw a lot of blood and the victims' bed pillows and blanket in the bathtub. She again returned to her bedroom.

In the second recorded police interview on November 5, 2009, defendant's mother gave the same information as on October 24 and added that, when defendant later left the house, she asked him what she should do, and he said, "You never [saw] me. I wasn't here." After defendant left, his mother went into the bathroom and saw the bathtub was now clean.

In her trial testimony, defendant's mother made every effort to recant her statements to police as the hallucinatory ravings of a lunatic. She repeatedly described herself as mentally ill. When she made the statements to police, she had been off psychiatric medications for at least three years. She later resumed seeing a psychiatrist and was taking Prozac for depression, Lorazepam for anxiety attacks, and Risperdal. On cross-examination by her son's attorney, defendant's mother recounted her extensive mental health history, including holds at mental health facilities under Welfare and Institutions Code section 5150. In 2003 or 2004, she assaulted a neighbor after hallucinating that the neighbor stole documents to get defendant in trouble. Doctors prescribed medications, but defendant's mother did not take them. Defendant's mother was placed on another hold in March 2005, was prescribed antipsychotic medication, but did not take it.

Laurie Clark testified she was friends with the victims and went to grade school with defendant. After the victims disappeared, defendant's mother told Clark not to let the police know that defendant had been at the 39th Street house. Quiroz testified

6

defendant's mother also wanted Quiroz to agree that defendant was not there because she did not want him to get in trouble.

In closing argument, defendant's trial counsel attempted to point the finger at Quiroz and even insinuated that maybe defendant's mother was the murderer, with no involvement by defendant.

During jury deliberations, the trial court conducted a hearing about one juror's reported refusal to deliberate. The court found the juror had intentionally concealed negative experiences with law enforcement during voir dire. The court replaced the juror with an alternate.

The jury found defendant guilty on both murder counts and found true the firearm and multiple-murder allegations. The trial court found true the prior serious felony allegation -- a 2004 burglary conviction. The court sentenced defendant to life in prison without possibility of parole and a consecutive term of 50 years to life for the two firearm enhancements.

DISCUSSION

I

*Exclusion of Evidence of Prior "Bizarre Behavior"*

Defendant complains the trial court excluded testimony by a property manager of apartments previously occupied by defendant's mother, that she engaged in bizarre behavior in 1998 and 2006. Defendant contends the ruling was an abuse of discretion and a violation of his constitutional right to present a defense. In a distinct argument improperly briefed under the same heading (Cal. Rules of Court, rule 8.204(a)), defendant claims the prosecutor committed misconduct by taking advantage of the error in closing argument, and any failure to object to the prosecutorial misconduct is attributable to ineffective assistance of defense counsel.

7

A. *Background*

Defendant moved in limine to introduce testimony from property manager Cliff Livens that in 1998, when defendant's mother was a tenant at the apartment complex he managed, she "made up affairs that different individuals within the apartment complex were supposedly having and behav[ed] in a very loud and bizarre manner in making these accusations in public locations." Defense counsel said, "basically similar things" happened in 2006 at a different apartment complex, but counsel did not have specifics.

The trial court excluded the evidence because it was remote in time in relation to defendant's mother's police interview in November 2009 (which the court misstated as "2010") and it did not shed light on whether defendant's mother was hallucinating when she spoke with police at that time. The court observed that maybe people *were* having affairs. In the court's view the property manager's testimony would have been cumulative to other evidence about defendant's mother's mental health issues including her own anticipated testimony that she hallucinates and has mental health issues. The trial court rejected the defense's proposal that the court hold an Evidence Code section 402 hearing.

The trial court also excluded defendant's mother's psychiatric records, which defense counsel agreed were inadmissible. He provided them to the prosecution only to demonstrate he had a good faith basis to explore the subject when he cross-examined defendant's mother.

In closing argument to the jury, the prosecutor argued defendant's mother had exaggerated her mental health issues "to try and seem worse," and "It was intensely obvious when she couldn't remember the answers to questions when I asked them, but she remembered the answers to all of the questions when [defense counsel] asked. Because she thought that [defense counsel] was trying to help her son, so she wanted to help him. She didn't need to try to play out and exaggerate her symptoms at that point."

Defense counsel argued to the jury that defendant's mother was like mathematician John Nash as portrayed in the movie "A Beautiful Life [Mind]" in that both were in and out of hospitals and battled hallucinations but could come to their senses with medication.

In rebuttal argument, the prosecutor said, "We know for a certainty that she's had no mental health hospitalizations since 2005. We don't actually know much about any mental health hospitalizations in 2005 because all that was produced on that was Rita Rose saying that she had mental health hospitalizations and her saying that she had issues." The defense objected this misstated the evidence, and the court reminded the jurors they were the fact finders. The prosecutor continued: "There's been no proof, there's been no one who come in and talk about any stays that Rita Rose has had at a mental hospital about anything like that. There was no one that talked about any issues that Rita Rose had with reality other than Ms. Rose, right? The people who knew Ms. Rose, the people who would have witnessed any kind of problems that she had with reality, those people came into court and all said that she was fine. There wasn't a single witness who said anything different other than Ms. Rose trying to accentuate, oh, the voices inside my head and things like that, right?"

B. *Analysis*

Defendant argues the trial court was wrong in excluding the property manager's testimony as remote. Defendant analogizes to admissibility of remote prior convictions where a defendant has not led a legally blameless life. Defendant argues the court was wrong in excluding the evidence as cumulative, because it was corroborating evidence that would rebut the inference urged by the prosecution that defendant's mother's admission of her own mental illness was an exaggeration designed to recant her statements to police. Defendant argues the exclusion of the evidence deprived him of the

9

federal constitutional right to present a defense challenging the credibility of defendant's mother's statements to police.

The constitutional right to present a defense is subject to established evidentiary rules designed to assure fairness and reliability in the ascertainment of guilt and innocence. (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324 [164 L.Ed.2d 503]; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297]; *People v. Lawley* (2002) 27 Cal.4th 102, 155 [ordinary rules of evidence do not impermissibly infringe on constitutional right to present a defense].) The trial court has discretion to impose reasonable limits, and the reviewing court will not disturb the judgment absent a showing that the trial court abused its discretion. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Implicit in the trial court's ruling was that the property manager's testimony would require undue consumption of time on a collateral matter, because perhaps defendant's mother was right about people having affairs, in which case she was just obnoxious, not hallucinatory. On this record, it does not appear the property manager could have testified that no one was having an affair.

Moreover, even assuming defendant's mother hallucinated in 1998 or even in 2006, such evidence would only be marginally probative, if at all, to show she hallucinated in her police interview in November 2009. In making that determination, the jury was aware that her descriptions to police about the location of wounds and the positioning of the victims' bodies matched the forensic evidence exactly and the jurors were able to observe for themselves her demeanor during the videotaped police interviews. A lay witness's opinion about her demeanor years ago, an opinion that could not be corroborated, added little if anything to the question whether she was hallucinating when she talked to the police after the murders here at issue.

We conclude there was no evidentiary error, and we therefore need not address defendant's other arguments that evidentiary error was prejudicial.

10

As to defendant's claim of prosecutorial misconduct (improperly presented under the heading of evidentiary error excluding the property manager's testimony), defendant argues the prosecutor committed misconduct by arguing there was no proof that defendant's mother had "ever" been in a mental hospital or had mental health problems, when the prosecutor knew about the hospitalizations. However, the prosecutor did not deny hospitalizations but said, "she's had no mental health hospitalizations since 2005."

Defendant complains the prosecutor went on to refer to absence of hospital records that the trial court had found inadmissible. Specifically the prosecutor said to the jury: "We don't actually know much about any mental health hospitalizations in 2005 because all that was produced on that was Rita Rose saying that she had mental health hospitalizations and her saying that she had issues." The defendant's attorney then objected based on the fact that the argument misstated "the evidence." The trial court did not expressly rule on the objection, but only reminded the jury that the jury was the ultimate finder of facts and the jury should "rely upon [what the jury had] heard and [the jury's] evaluation of the evidence.

As noted earlier, defense counsel agreed the records were inadmissible and said he provided them to the prosecution only to demonstrate a good faith basis to explore the subject when he cross-examined defendant's mother.

Contrary to defendant's contention, his objection that the prosecutor was misstating the evidence did not preserve an objection on the ground of prosecutorial misconduct in commenting about evidence that existed but could not be presented. Defense counsel's objection that the prosecutor was misstating the evidence was not sustainable because the prosecutor's argument was an accurate statement of the evidence. If defendant had objected on the grounds of prosecutorial misconduct (as he does here), that objection could have been discussed and resolved in the trial court. (*People v. Thomas* (2012) 54 Cal.4th 908, 937-938 [claim forfeited where objection in the trial court was not on the specific ground of prosecutorial misconduct raised on appeal].)

11

Defendant cites *People v. Scott* (1978) 21 Cal.3d 284, 290, for the proposition that an objection may be deemed preserved where the record shows the court understood the true objection despite "inadequate phrasing." We find nothing in the record to suggest that the trial court understood that defendant's objection was in fact one based on prosecutorial misconduct.

Defendant argues if he forfeited the objection, it is his trial counsel's fault. However, defendant fails to show the prejudice element of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, defendant must demonstrate his trial counsel's representation fell below an objective standard of reasonableness and the defect prejudiced defendant in that there is a reasonable probability that, but for the deficiency, defendant would have obtained a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674] (*Strickland*); *People v. Williams* (1997) 16 Cal.4th 153, 215 (*Williams*).)

Defendant argues he was prejudiced because his mother's statements to police were the only evidence of defendant's guilt. However, defendant does not argue the hospital records should have been admitted. Assuming defense counsel had made the objection, the trial court would, at most, have merely reminded the jurors not to speculate about matters not in evidence, as they learned from the jury instructions. There was no prejudice under any standard.

We conclude there is no merit to any of defendant's multi-faceted arguments, improperly combined in violation of the obligation to present each argument under a separate heading (Cal. Rules of Court, rule 8.204).

II

*Failure to Instruct Jury to View Defendant's Statements with Caution*

Defendant argues the trial court erred by failing to instruct the jury sua sponte with CALCRIM No. 358, to view with caution his words to his mother as she recounted to the

12

police: "You never [saw] me. I wasn't here." Defendant argues omission of the instruction was critical because without the instruction the jury likely believed his mother lied when she told people defendant had left before the weekend. We conclude any error was harmless.

CALCRIM No. 358 states: "You have heard evidence that the defendant made [an] oral or written statement (before the trial/while the court was not in session). You must decide whether the defendant made any [such] statement, in whole or in part. If you decide that the defendant made such [a] statement, consider the statement, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement. [¶] [Consider with caution any statement made by [the] defendant tending to show [his] guilt unless the statement was written or otherwise recorded.]"

"When the evidence warrants, the court must instruct the jury sua sponte to view evidence of a defendant's oral admissions or confession with caution. [Citations.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) The standard of review for error is whether it is reasonably probable the jury would have reached a result more favorable to the defendant had the instruction been given. (*Ibid*.) Failure to give this instruction is not one of the narrow categories of error that render a trial fundamentally unfair for federal due process purposes. (*Ibid*.) The purpose of the instruction is to assist the jury in determining if the statement was in fact made. (*Ibid*.) Courts examining prejudice in omission of the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. (*Ibid*.) Where there was no such conflict, but simply a denial by the defendant that he made the statement, courts have found the failure to give the instruction harmless. (*Id*. at p. 906.)

Here, there was no conflicting evidence, or even a denial by defendant.

13

Defendant argues he was prejudiced because, apart from his mother's testimony that defendant told her to deny he had been at the house, her account was just as consistent with herself being the murderer with no involvement by defendant. Defendant argues the mere fact that his mother lied about defendant's whereabouts, and that defendant told her to do so, would be enough to support an inference that she was lying at his behest; and that inference would not have been possible had the court instructed with CALCRIM No. 358 and had the jury found defendant never made the statement in the first place. However, defendant simply assumes the jury would have found he never made the statement. Defendant cannot show prejudice by assuming prejudice. It is not reasonably probable the jury would have reached a different result had the instruction been given.

For the same reason, we reject defendant's contention that trial counsel was deficient in failing to request the cautionary instruction. Defendant argues there could be no tactical reason not to ask for the instruction, but he fails to show the requisite prejudice.

### III

*Omission of CALCRIM No. 371C*

Defendant argues his trial counsel was ineffective in failing to ask the court to instruct the jury with CALCRIM No. 371 Alternative C, that a third party's concealment of evidence is not attributable to the defendant unless he was present or authorized the concealment. Defendant claims there was evidence his mother hid evidence (by cleaning the blood from the bathroom and by throwing trash bags with bloody bedding into the dumpster) and Satyna tried to hide evidence (by dumping the trash can in the field). Defendant fails to show ineffective assistance of counsel.

The court instructed the jury with CALCRIM No. 371 Alternative A: "If the defendant tried to hide evidence or discourage someone from testifying against him, that

14

conduct may show that he is aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

The prosecutor argued to the jury that defendant tried to suppress evidence in two ways: (1) He hid the bodies and cleaned up the bloody evidence, and (2) he told his mother to say he was not there.

Defense counsel suggested to the jury that maybe defendant's mother committed the murders because she was mentally ill, was angry that Tammy was not doing her job, and maybe she had people (other than defendant) willing to do things for her such as stashing dead bodies in garbage cans.

The defense did not ask the court to instruct the jury with CALCRIM No. 371 Alternative C: "If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of (his/her) guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself."

To prevail on a claim of ineffective assistance of counsel, defendant must demonstrate his trial counsel's representation fell below an objective standard of reasonableness and the defect prejudiced defendant in that there is a reasonable probability that, but for the deficiency, defendant would have obtained a more favorable result. (*Strickland, supra*, 466 U.S. at pp. 687-688 [80 L.Ed.2d 674]; *Williams, supra*, 16 Cal.4th at p. 215.)

Defendant claims the evidence at trial "irrefutably" showed that his mother and Satyna tried to conceal evidence. He claims his mother and the other women loaded the victims' bloody bedding into the car and took it to a dumpster. His mother also told police she had cleaned up the bathroom after finding those same bloody blankets and

15

linen in the bathtub. Defendant claims Satyna wheeled the garbage can to a nearby field "in an apparent effort to prevent the discovery of one of the bodies." Defendant claims there was no evidence he was present or authorized his mother's or Satyna's "unambiguous attempts to hide evidence."

Defendant misrepresents the record. While the stench should have been a clue, there was no unambiguous evidence that Satyna knew the garbage can contained a dead body when Satyna wheeled the container to the empty field to dump it. His looking around before taking the garbage can to the field was consistent with not wanting to be observed engaging in illegal dumping. Satyna's demeanor when he returned to the house was consistent with being surprised in the field. Defendant's mother testified she first learned there was a dead body in the garbage can when Satyna went to dump the garbage can in the field so they could proceed with their house-cleaning, and he came back "freaked out" at finding a dead body in the can.

Further, there was no unambiguous evidence the defendant's mother or the other women knew there was bloody bedding in the trash bags they took to the dumpster. Although two of the bags were split open when police retrieved them from the dumpster, the neighbor who testified about the bags being loaded into the car did not say they were split open at that time. Contrary to defendant's insinuation, his mother did not tell police she removed the bloody *bedding* from the bathroom. Rather, she told police she saw bed pillows and a lot of blood in the bathtub and maybe a thin blanket. After defendant left, she went in the bathroom, and the pillows and blanket were gone. She then cleaned the bathroom.

Where the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, we reject the claim of ineffective assistance of counsel, unless counsel was asked for an explanation in the trial court and failed to provide one, or there could be no satisfactory explanation. (*People v. Stewart* (2004) 33 Cal.4th 425, 459.) Defendant here fails to show deficient performance. The defense may have preferred not

16

to call additional attention to defendant's mother's efforts to protect her son, preferring instead to insinuate that she concealed evidence to cover up her own crimes. While this theory was farfetched, defense counsel had little to work with. Moreover, had the instruction been given, the jurors may have inferred that defendant authorized his mother's concealment efforts by telling her, "I wasn't here." Even if they concluded defendant's mother acted on her own to protect her son, knowing he was guilty, defendant would not have obtained a more favorable result.

We conclude defendant fails to show grounds for reversal in omission of CALCRIM No. 371C.

IV

*Prosecutorial Misconduct*

Defendant argues the prosecutor committed misconduct in closing argument by commenting that defendant laughed during trial as he watched his mother's distress in the videotaped police interview. Defendant forfeited the matter by failing to object in the trial court (*People v. Fierro* (1991) 1 Cal.4th 173, 212), but on appeal argues forfeiture should be excused. We see no basis for reversal.

The prosecutor told the jury: "Something else that you may have noted when we were playing clip five, that last clip in court for the first time. During those periods of intense emotion when Ms. Rose started to cry, you heard coming from [defendant] snickering sounds. It sounded essentially like laughter. And what that demonstrated to you was how much regard [defendant] has for his mom or for anyone else for that matter, and the answer would be not very much. Not very much."

On appeal the People acknowledge it was improper for the prosecutor to comment on defendant's courtroom demeanor because (1) demeanor evidence is relevant only as it bears on witness credibility; (2) the comment infringes on defendant's right not to testify; and (3) consideration of defendant's behavior while not on the witness stand violates the

17

rule that criminal conduct cannot be inferred from bad character. (*People v. Boyette* (2002) 29 Cal.4th 381, 434.)

In an attempt to overcome his failure to object at trial, defendant claims on appeal there is an "exception" to the forfeiture rule when the case is closely balanced and there is grave doubt of the defendant's guilt, and the prosecutorial misconduct contributed materially to the verdict. However, what defendant describes is appellate courts' power to exercise discretion to review a forfeited claim. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6; *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1585-1586.) Defendant offers no reason for us to exercise such discretion in this case. He merely asserts the comment bolstered the prosecution's case because, if defendant was contemptuous of his own mother, it would stand to reason he would be even more contemptuous of virtual strangers like the victims. However, defendant himself displayed his contempt for his mother in open court, for all the jurors to see. While it is true the prosecutor commented on it improperly, a timely objection to the comment would not have been futile, and timely admonition would have easily sufficed to avoid any possible prejudice from the prosecutor's comment. This is not an appropriate case to excuse the forfeiture.

Defendant alternatively argues trial counsel's failure to object in the trial court constituted ineffective assistance of counsel. We have two answers to defendant's argument. First, his attorney may well have thought that objection to the prosecutor's comment was not a good tactical choice, risking as it would have further attention to defendant's conduct. Moreover, defendant cannot prevail because he fails to show prejudice, i.e., a reasonable probability that, but for the deficiency, he would have obtained a more favorable result. (*Strickland, supra*, 466 U.S. at pp. 687-688 [80 L.Ed.2d 674]; *Williams, supra*, 16 Cal.4th at p. 215.)

Defendant argues our prejudice analysis should include his prejudice arguments relating to exclusion of the property manager's testimony. However, we concluded the

trial court did not err in excluding that testimony. Therefore, defendant's arguments (e.g., that exclusion impaired defendant's ability to challenge the reliability of his mother's statement to police) have no bearing on the prejudice analysis with respect to the prosecutor's comment about defendant snickering.

Defendant argues he was prejudiced by the prosecution pointing out his snickering, because this was a close case and the prosecution's improper character inference was a powerful one that supplied an explanation for an otherwise unexplainable killing, i.e. defendant killed the victims because he is a sociopath who lacks feeling or empathy even for his own mother. This prejudice argument is a stretch. Moreover, any inference would have come from defendant's snickering, not from the prosecutor's brief mention of it.

V

*Removal of Juror During Deliberations*

Defendant argues the trial court abused its discretion and violated defendant's constitutional right to a jury trial by removing the last holdout juror during deliberations on the ground he concealed his negative experiences with law enforcement during voir dire. We reject the contention.

A. *Background*

During voir dire, the court asked prospective jurors including Juror No. 6: "Have you, a family member or close friend ever had a negative experience with law enforcement that didn't necessarily result in an arrest, but it was still negative for you?" No one responded. The court then asked Juror No. 6 about himself. He said he was self-employed training school teachers and administrators and was a former principal of Luther Burbank high school.

The jurors began deliberations on Monday, April 16, 2012. At 3:30 p.m. the next day, the jury informed the court it was unable to reach a verdict. The jurors had voted

19

three times; the results were 10-2, 11-1, and 11-1, on both counts. Over defense objection, the court gave the jurors additional instructions, excused them for the day, and ordered them to resume deliberations the next day. The next day, the jury sent the court a note at noon asking, "What do we do when we have a juror who's not following the rules?"

The court told the parties it would conduct narrow questioning.

First up was the foreperson, Juror No. 12, who said Juror No. 6 within the first hour of deliberations made comments that the other jurors would have to convince him. He called the three police officers the Three Stooges. When the jurors wanted to go over some evidence, he threw up his hands and said he was done.

The trial court questioned the other jurors, most of whom said Juror No. 6 made up his mind early and was no longer engaging in deliberations. Some said he had a bias against police officers or detectives.

The trial court asked Juror No. 6 if he had a bias and, if so, whether he had been able to set it aside. The juror said, "I have been able to put any bias that I may have aside." The judge mentioned the voir dire question about bias against law enforcement. The juror said he has had "both positive and negative relationships with police officers over a period of time" and was "sure" he answered the question during voir dire. He believed he was participating in deliberations. He understood the prosecution did not have to prove motive. When the court asked if he was biased against law enforcement, Juror No. 6 said, "I don't have a bias. I think I understand the positive and the negatives relating to the law enforcement." He admitted referring to the police officers as the Three Stooges.

The court did not recall Juror No. 6's answer during voir dire to the question whether the juror had any negative experiences with law enforcement officers. When the court now asked Juror No. 6 about negative experiences with law enforcement, he said, "I got a ticket for making an illegal right turn, and I took it to court I guess and I won."

20

"[T]he only thing negative about it was I was accused of doing something, and the officer really didn't have all of the information to . . . make a judgment in the first place." He also said, "as a high school principal probably, um, watching officers break up a fight a little more heavily than I would have liked maybe. [¶] . . . [¶] Stopping the kids in front of the school or those kind of issues, you know, but I had good relationships with the captain, and I could call him and he would always straighten those kind of issues out for me." The juror said he had also known some good school resource officers (SROs). One negative experience was that a new SRO "almost started a riot"; he was "walking around excited about being on campus and started talking to students and conversation got out of hand. And he didn't understand where to go from when things got bad to worse so to speak. We had to go and rescue him, that kind of thing. I mean we didn't want our kids to get shot or maced or anything like that. So we had to come to his assistance." By the time Juror No. 6 got there, the SRO was surrounded by 15 or 20 kids. Juror No. 6 got the SRO replaced. "If you don't have the kid skills, you don't do well in that position."

Another negative experience was that Juror No. 6's child attends school in Natomas, and the juror was part of the community organization making sure the school is a place the parents can be proud of, and "[o]ne of the things we did not like was how, um, police interacted with our kids." "[T]hey were too quick to arrest. I mean they would arrest for fighting. And the days that I went to school we never sent kids to jail for fights. Just typical -- it just seemed we had -- and it was really one bad officer, and we had to really work hard to get rid of him." It took most of the year to get rid of him. This happened a couple of years ago.

The juror said his own son "got stopped by the local security" four or five years earlier, when the son was 11 years old. Paladin security stopped the child and "wasn't satisfied with his answers. And we're talking I got the greatest kid in the world." The Paladin security person "decided that he needed more information from the kid. He needed the color of law. So he held my . . . kid there when he was with his friend and

21

called in Sac P.D. to come in. And I didn't take kindly to that as a parent. And we had all the officers, we had their bosses in my house explaining to me how that's possible that a Paladin person can stop my kid. Then a police officer will come in and intercede in my community?" The juror said he was satisfied with the police response to the Paladin situation. The police officer asked the child a couple of questions and let him go. The juror had the meeting at his house because he wanted the police to explain how Paladin had the right to stop his son.

The trial court then asked:

"Q   Okay. During voir dire when we were questioning prospective jurors do you remember me asking if you ever had a negative experience with law enforcement that didn't necessarily result in an arrest, but it was still negative for you? Do you recall that question being asked by me?

"A   You know, as you say that I do remember the question.

"Q   Okay.

"A   I do remember the question.

"Q   Okay. Anything else, Counsel?

"A   Well --

"Q   I'm sorry. Go ahead.

"A   I do remember the question. Go ahead. I don't know where I was.

"Q   Okay. I appreciate that."

The trial court found Juror No. 6 committed misconduct by intentionally withholding during voir dire a bias against law enforcement that, if it had been disclosed, would most assuredly have resulted in a peremptory challenge. The prosecutor confirmed he would have excused the juror. The court found the negative experiences described by the juror were of such a nature that he could not have unintentionally forgotten about them when he sat silent in response to the court's question about negative experiences with law enforcement. The court disbelieved the juror's claim that he could

22

be impartial. The court said the juror "did acknowledge that during initial voir dire at least sort of -- and I put that in quotes -- sort of that he equivocated, but then he did acknowledge, yes, he did recall being asked the question about negative experiences with law enforcement."

The court noted the other jurors said defendant appeared biased against law enforcement during deliberations. The court noted that when it gave the jury additional instructions in response to the deadlock, Juror No. 6 had his back turned to the judge for half the instruction. The trial court rejected defense counsel's spin attributing the juror's posture to a quest for comfortable accommodation of his six-foot-plus height.

After argument by counsel, the trial court reiterated its findings that the juror had deliberately withheld information during voir dire. He had an agenda and was dishonest with the court. He had a bias and prejudged the case. The court found the juror had not deliberated in good faith but was not removing him for failure to deliberate.

B. *Analysis*

"If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take [the discharged juror's] place . . . ." (§ 1089.) A juror's failure to disclose bias against law enforcement is misconduct warranting discharge. (*People v. Wilson* (2008) 44 Cal.4th 758, 822-823 (*Wilson*); *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 (*Barnwell*).)

On appeal, we determine whether the ground for disqualification appeared as a "demonstrable reality," which entails a more comprehensive and less deferential review than the substantial evidence inquiry. (*Barnwell, supra*, 41 Cal.4th at pp. 1052-1053.) Demonstrable reality requires a showing that the trial court, as trier of fact, did rely on evidence that, in light of the entire record, supports its conclusion that bias was

23

established. (*Ibid*.) Although we do not reweigh the evidence, in order to affirm we "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Ibid*.) We limit our inquiry to the reasons actually relied upon by the trial court and sufficiency of evidence to support those reasons. (*Wilson, supra*, 44 Cal.4th at p. 821.) Where the evidence is in conflict, we afford deference to the trial court's firsthand observation of the "nuances attendant upon live testimony" which are unavailable to us on appeal. (*Barnwell, supra*, 41 Cal.4th at p. 1053.)

Here, the record as a whole, recounted above, clearly shows that the trial court's stated reasons for discharging the juror (withholding information during voir dire and dishonesty) appeared as a demonstrable reality.

Defendant argues the incident about his traffic ticket was trivial, and he won in court. But the juror expressly stated it was "negative" in that the officer accused him without grounds. Moreover, defendant cites no authority that each incident must be separately significant enough to generate bias, rather than bias developing from a cumulative effect of several incidents.

Defendant argues the incident with the juror's son was not a negative experience with law enforcement but merely a negative experience with a private security company. Not so. The juror made "all the officers" and their "bosses" come to the juror's home to explain how Paladin could "stop my kid. Then a police officer will come in and intercede in my community?"

Defendant argues the juror was not required to disclose the other incidents during voir dire because they were not negative experiences for the juror, his family members, or close friends -- the only persons mentioned in the voir dire question. However, they *were* negative experiences for the juror. Though he was not the target of the police conduct, the question did not require that the juror be the target. Moreover, the totality of these

24

incidents, together with the other incidents, obviously shaped the juror's bias against law enforcement.

Defendant's reply brief takes issue with the People's argument that the juror, by stating, "I don't know where I was," admitted he had no good reason for failing to respond to the question in voir dire. Defendant argues "it is clear that [the juror] simply meant that he had lost his train of thought after the court interrupted him seconds earlier." We do not see it as "clear," but in any event we do not rely on defendant's answer to the court's question in finding no error in the court's dismissal of this juror.

VI

*No Cumulative Prejudicial Error*

Having reviewed all of defendant's contentions, we reject his argument that the cumulative effect of errors call for reversal.

DISPOSITION

The judgment is affirmed.

      HULL      , Acting P. J.

We concur:

     MAURO     , J.

     DUARTE    , J.

25